Entered on Docket
September 28, 2023
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes the order of the Court.
Signed: September 28, 2023

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re:

TANJILA ISLAM,

    Debtor.

Case No. 22-40278 CN
Chapter 7

---

RICHARD KORAL,

    Plaintiff,

v.

TANJILA ISLAM,

    Defendant.

Adversary No. 22-4036 CN

**MEMORANDUM DECISION AND ORDER DETERMINING DISCHARGEABILITY OF DEBT AND DISCLOSURE OF JUDICIAL NOTICE TAKEN BY THE COURT**

On August 8, 2023, the court concluded a two-day trial in this adversary proceeding, and all appearances were noted on the record. Plaintiff Richard Koral seeks a non-dischargeable judgment under Bankruptcy Code §§ 523(a)(2)(A) and (a)(6) against defendant Tanjila Islam for misrepresentations made by TigerTrade Services, Inc. ("TigerTrade") that induced him to loan TigerTrade $506,026.45 in September 2017. Islam was TigerTrade's sole equity interest holder and president, and she negotiated the loan terms with Koral. Islam also personally guaranteed the loan. As the parties are aware, many of this adversary proceeding's pertinent facts were established for purposes of trial

through this court's Federal Rule of Bankruptcy Procedure 7056(g) order. After reviewing the parties' dueling summary judgment motions, this court determined, pursuant to Rule 7056(g), that the promissory note contained material misrepresentations which Koral justifiably relied on to his detriment. The two-day trial was meant to address, among other things, whether Islam knowingly made those misrepresentations with the intent to deceive Koral. The following constitutes this court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052(a)(1) which incorporate this court's Rule 7056(g) determinations.

**FINDINGS OF FACT**

In 2017 and at all relevant times thereafter, Islam was the owner and president of TigerTrade, an entity which (among other things) imported foreign made apparel for the off-price market. TigerTrade was the classic "middleman" operation, and it typically imported goods with the intent of selling them to the retail trade. In or about August 2017, Islam approached Koral (who had been a successful businessman in the off-price apparel market) for a loan to finance TigerTrade's purchase of foreign made apparel which it intended to sell to Mexican buyers. In one of her preliminary emails to Koral, Islam represented to him that she had a "current deal" with two "long-time" Mexican buyers for goods located in Poland. She informed Koral in her August 30, 2017 email that she had already done over three million dollars in deals in 2017 with these buyers and that TigerTrade had another three million dollars "in the pipeline with them." She further informed him that the goods would be shipped from Poland to a bonded warehouse in Laredo, Texas from where "the buyers ship across the border to Mexico." Islam anticipated that the goods would be in transit for approximately five weeks. After some negotiation regarding the structure of this deal, the parties agreed that Koral would lend TigerTrade 421,759 Euros[1] to finance TigerTrade's purchase of the apparel described in the August 30, 2017 email (the "Goods"). The parties' Secured Promissory Note & Security Agreement (the "Note"), dated September 11, 2017, had a December 31, 2017 maturity

---

[1] The parties do not dispute that the loan when converted to dollars totaled $506,026.45.

date and it a) granted Koral a security interest in the Goods, b) required TigerTrade to provide the Bills of Lading to Koral "upon shipping," and c) prohibited TigerTrade (absent Koral's consent) from exchanging, leasing, using, selling or disposing of the Goods or doing anything that may impair the Goods' value and the security and insurance coverage. Koral understood that TigerTrade would release the Goods to the Mexican buyers only after they paid for them.[2] While the Note does not explicitly so state, it was clear that TigerTrade intended to use the funds from this sale to repay Koral.

TigerTrade used Koral's funds to complete its purchase of the Goods, and the Goods arrived in the Laredo bonded warehouse in mid-November 2017. The Goods thereafter disappeared from the warehouse and TigerTrade claims that Javon never paid for them. While some of the "who," "what," and "where" questions remain unanswered, several salient facts are certain: TigerTrade never repaid the Note; Javon removed the Goods from the bonded warehouse without Koral's consent and moved them to Mexico; TigerTrade and Islam delayed informing Koral of the Goods' removal from the warehouse for as long as possible; and there is no credible evidence that Islam, despite testifying that the Goods were wrongfully removed, ever a) investigated why the Goods were removed, b) discussed their allegedly unauthorized removal with Basil Logistics (the company that operated the bonded warehouse), or c) confronted Javon regarding its alleged theft of the Goods. Instead, Koral got, for lack of a better description, the "runaround."

After the December 31, 2017 maturity date came and went, Islam responded to Koral's payment inquiries by informing him that Javon had reneged on its purchase and was not going to buy the Goods. She further informed Koral that Javon was having difficulty selling the apparel from a previous deal with TigerTrade, and she asked Koral if he could assist in selling the Goods and the slow-moving inventory (the "Miss Sixty Apparel" purportedly located in Panama) from her earlier deal with Javon. Over the next few months, Koral attempted to use his industry connections to help TigerTrade sell the

---

[2] Islam identified the buyers as two brothers, Benny and Moises Amiga, who owned a Mexican company known as Javon, S.A. The court will refer to the buyers as "Javon."

Miss Sixty Apparel and the Goods. While Islam asserts that Koral's efforts are proof that he agreed to modify the Note and look to the sale of the Miss Sixty Apparel for payment, Koral agreed to nothing of the sort. The Note provides that it can only be modified or amended by a "written agreement executed by Company and Lender," and no such document was introduced into evidence. Instead, the evidence clearly indicates that Koral's efforts to assist TigerTrade in selling the Miss Sixty Apparel were for the sole purpose of generating income that would allow TigerTrade to repay the Note.[3]

Koral also tried, in early 2018, to help TigerTrade sell the Goods, which he still believed were being held in the Laredo bonded warehouse. In early April 2018, Koral informed Islam that a business associate, Henry Alger, was interested in inspecting the Goods and possibly purchasing some of them. When Islam learned of Alger's interest, she only then informed Koral that the Goods were no longer in the Laredo warehouse but with Javon in Mexico. This exchange was the first time Koral learned that the Goods had been released from the warehouse without his permission.[4]

Before proceeding further, a brief explanation of Bills of Lading is necessary. A Bill of Lading is the primary legal document used in sea transport. It functions as a contract of carriage, transport goods receipt and (most importantly in this case) as the document of title indicating who owns the shipped goods. 1 Saul Sorkin, *Goods in Transit* § 2.01 (2023 Matthew Bender). Once goods "pass through" Customs, they are typically released to the person who holds the Bill of Lading. Here, the Bill of Lading for the Goods named TigerTrade as the consignee (*i.e.*, the entity who bought the Goods). Shipped goods that are subject to a Bill of Lading may be released by a "Telex Release." *See* Mark L. Shope,

---

[3] Koral believed that the Miss Sixty Apparel was stale product with little market value. While Islam's counsel attempted to impeach Koral regarding its market value—purportedly to generate evidence that he had failed to "mitigate his damages"—this line of questioning provided no relevant evidence. Koral was under no contractual or legal duty to assist TigerTrade in selling the Miss Sixty Apparel. He simply wanted to get paid, and if he could help TigerTrade in that effort, so be it.

[4] Her statement also contradicted her prior representation that Jovan was no longer interested in the Goods.

*The Bill of Lading on the Blockchain: An Analysis of its Compatibility with International Rules on Commercial Transactions*, 22 Minn. J.L. Sci. & Tech. 163, 200 (2020) ("A 'Telex release' is an industry term that refers to the release of cargo at one port when the bill of lading was presented somewhere else."); *see also Justen-Marks Mfg. v. Soft Things*, 2008 U.S. Dist. LEXIS 144250, at *2 n. 1 (E.D.N.Y. Jan. 30, 2008) (explaining that a shipper will release goods to a buyer usually only after the shipper receives the bills of lading or if the seller authorizes the release by a telex or email). When a shipment is telex released, it signifies that the cargo owner has authorized the carrier to release the cargo to a named Release party without the presence of the original Bill of Lading. Shope, *The Bill of Lading on the Blockchain*, *supra*, at 200.

Islam testified that she did not authorize the release of the Goods. The court does not find her testimony credible. First, Islam's description of Javon as a trusted and long-time buyer was not quite accurate. TigerTrade and Javon jointly purchased the Miss Sixty Apparel and had agreed that they would share the sales proceeds after Javon sold the goods. The Miss Sixty deal predated the Note, and TigerTrade had invested nearly a million dollars in the purchase of the Miss Sixty Apparel. Javon reneged on the Miss Sixty deal and refused to share any of the sales proceeds with TigerTrade, purportedly because it was having trouble selling the Miss Sixty Apparel. While Islam did not definitively state when she learned that Javon was breaching this contract, the evidence suggests that she knew that trouble was brewing close to when the parties executed the Note. Islam also testified that she repeatedly asked Javon to pay for the Goods and that she never authorized the warehouse to release the Goods to Javon. The court discounts this testimony. Islam states that she primarily communicated with Javon by telephone or through the WhatApp software, and that she no longer had the cell phone through which she could access these exchanges. Yet, several emails between Islam and Javon were introduced into evidence, including emails which instructed a TigerTrade employee to send the Bills of Lading to Javon and, critically, a series of October 17, 2017 emails between Basil Logistics, TigerTrade, and Javon in which 1) Basil Logistics advised TigerTrade and Javon that it

needed a Telex Release for the Goods, and 2) Islam replied by instructing a TigerTrade employee to send the Telex Releases to Basil Logistics. These emails bely Islam's testimony that she did not authorize Javon's removal of the Goods.

One would suspect that Javon's removal of the Goods without payment would have generated a storm of angry communications from Islam to Javon, not to mention similar emails to Basil Logistics regarding why it released the Goods. Other than her self-serving testimony, no such evidence was introduced. Nor did Islam introduce a) any documentation indicating that Javon had agreed to pay for the Goods upfront or b) any corroborating evidence from Basil Logistics stating that Javon improperly removed the Goods.

In February 2019, Koral sued TigerTrade and Islam on the Note and guarantee in the United States District Court for the Central District of California. After TigerTrade and Islam failed to respond to the first amended complaint, the District Court entered a default judgment against them on September 9, 2019 for $638,089.96 in damages and $16,623.19 in attorney's fees (the "Default Judgment"). The parties acknowledge that Koral has recovered $272,032.24 of the amount due[5] and that the unpaid principal balance of the Default Judgment was $382,680.91 when Koral filed his complaint herein.[6]

**CONCLUSIONS OF LAW**

Koral asserts that Islam defrauded him when she represented that she would not release the Goods without his consent and first receiving payment, and that his resultant

---

[5] Paragraph 23 of Koral's complaint in this adversary proceeding states that Koral has recovered $272,032.24 from Islam/TigerTrade. Islam testified during trial that she had paid $250,000 towards the Default Judgment. She did not describe how she paid these funds or whether they were in addition to the amounts listed in paragraph 23. The court therefore discounts this testimony.

[6] Koral's first amended District Court complaint sought damages for breach of the promissory note, money lent, breach of the guaranty, money had and received, fraud, and unjust enrichment. This court determined during the parties' summary judgment proceedings that the Default Judgment has no issue preclusive effect. The court finds, however, that the Default Judgment amount reflects the damages that Koral incurred due to Islam's fraud. The court takes judicial notice of Paragraph 23 of Koral's complaint in this adversary proceeding and Islam's response to Paragraph 23's allegations under Federal Rule of Evidence 201.

damages (*i.e*, the Default Judgment) are non-dischargeable under Bankruptcy Code §§ 523(a)(2)(A) and (a)(6). Bankruptcy Code § 523(a)(2)(A) provides in relevant part that a debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation or actual fraud" is nondischargeable in a Chapter 7 case. Koral has the burden of establishing this claim by a preponderance of the evidence (*see Grogan v. Garner,* 498 U.91.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)), and he must demonstrate that a) Islam made the false representations in question, b) she knew they were false when she made them, c) she made them with the intention and purpose of deceiving Koral, d) Koral relied on her representations, and e) he sustained damages as the proximate result of the misrepresentations having been made. *Ghomeshi v. Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010). Koral has met his burden of proof. Islam misrepresented that TigerTrade would not release the Goods without payment, she knew that this was a false statement, and she made it to obtain the funds from Koral. Koral relied on her representation, and the Default Judgment represents his damages.

This court is aware that nondischargeability claims should be strictly construed against creditors and in favor of debtors, and that Islam testified that she fully intended for Javon to pay for the Goods before their release. Fraudulent intent, however, is rarely conceded on the witness stand, and Islam's actions and emails undercut her testimony. Islam provided no evidence that Javon had agreed to pay for the Goods upfront, and Islam's instruction to her employee to provide a Telex Release to Basil Logistics only a few weeks after she borrowed the funds indicate that she intended to promptly release the Goods to Javon after their arrival in Laredo. Had she intended differently, she would have introduced some fiery evidence demanding explanations from Javon and Basil Logistics. No such evidence was introduced.

Accordingly, Koral is entitled to a nondischargeable judgment under Bankruptcy Code § 523(a)(2)(A) in the amount of $382,680.91, plus appropriate pre and post-petition interest, any awardable attorney's fees, and any other appropriate relief under Federal Rule

of Bankruptcy Procedure 7058.

Koral further contends that Islam's conduct was willful and malicious under Bankruptcy Code § 523(a)(6). Under Bankruptcy Code § 523(a)(6), an individual debtor may not discharge a debt resulting from a willful and malicious injury to another entity or to the property of another entity. An injury is "willful" if the debtor had a subjective motive to inflict the injury or believed that injury was substantially certain to occur because of their conduct. *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001). "A 'malicious' injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *In re Jercich*, 238 F.3d at 1209. Koral must satisfy these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 291. Koral has not met his burden of proof as to either element. Islam's conduct was not willful because she intended to repay the Note, and the evidence did not establish that it she was substantially certain that Jovan would not pay for the Goods when TigerTrade borrowed the funds. Moreover, while Islam's misrepresentations were wrongfully and intentionally made without just cause or excuse, they are actionable under § 523(a)(6) only if Islam knew at the Note's execution that Javon would breach its contract with TigerTrade. Koral did not establish this fact by a preponderance of the evidence.

**PLEASE TAKE NOTICE** that pursuant to Federal Rule of Evidence 201(e), the parties have two weeks from the entry of this memorandum decision to object to this court's taking of judicial notice of the allegations in Paragraph 23 and Islam's rely to Paragraph 23 in her answer. If any party timely objects, the court will conduct a hearing on the objection at a date and time set by the court. If no party timely objects, Koral is instructed to submit a proposed Judgment to this court.

***END OF ORDER***

Adversary No. 22-4036 CN

## COURT SERVICE LIST

J.C. Flores
675 E. Santa Clara St. #67
Ventura, CA 93001

All Other Recipients are ECF participants